IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

KERRY ARPAJIAN,

        Plaintiff,

    v.

PROPERTY SOLUTIONS, INC.,
TIMOTHY DOWNES, and EDWARD
GALLAGHER,

       Defendants.

HONORABLE JEROME B. SIMANDLE

Civil Action No. 03-4666 (JBS)

**OPINION**

APPEARANCES:

Stephen G. Console, Esq.
Gianna M. Karapelou, Esq.
CONSOLE LAW OFFICES, LLC
1525 Locust Street, 9th Floor
Philadelphia, PA 19102
    Attorneys for Plaintiff

Matthew V. DelDuca, Esq.
Christopher J. Kelly, Esq.
DECHERT LLP
997 Lenox Drive
Building 3, Suite 210
Lawrenceville, NJ 08543
    and
Michele M. Fox, Esq.
BALLARD SPAHR ANDREWS & INGERSOLL
Plaza 1000, Suite 500
Main Street
Voorhees, NJ 08043-4636
    Attorneys for Defendants

**SIMANDLE**, District Judge:

This employment discrimination case comes now before the

Court upon Defendants' motion for summary judgment.  All

discovery has been completed, and the Court is called upon to

assess which, if any, of Plaintiff's claims have evidentiary

support sufficient to be submitted to a jury at trial.  This
motion requires the Court to address issues of the statute of
limitations under the state and federal statutes governing
discrimination in the workplace, as well as the evidentiary
standard necessary to maintain a claim of hostile work
environment, retaliatory employment action, and punitive damages.
For the following reasons, the motion for summary judgment will
be denied.

## I.   BACKGROUND

This matter arises out of the employment relationship
between Plaintiff, Kerry Arpajian, and Defendants, Property
Solutions, Inc., Timothy Downes, and Edward Gallagher.  Defendant
Property Solutions, Inc. ("Property Solutions") is an
environmental and engineering consulting firm headquartered in
Moorestown, New Jersey.  In March 1999, Property Solutions was
owned by two individuals, equally: Theresa Downes and Defendant
Edward Gallagher ("Gallagher").  (Deposition of Theresa Downes at
20:24-21:4.)  Theresa Downes controlled the accounting and human
resources functions, Defendant Gallagher ran the environmental
and engineering departments, and Theresa Downes's husband,
Defendant Timothy Downes ("Downes"), was in charge of sales and
marketing.  (Deposition of Edward Gallagher at 17:21-18:1.)

On April 26, 1999, Plaintiff Kerry Arpajian ("Arpajian"), a
Certified Public Accountant, was hired by Defendant Property

Solutions in the position of Chief Financial Officer ("CFO").
(Deposition of Kerry Arpajian at 47:20-22; 48:14-17.)   The
decision to hire Plaintiff was made by then-President, Theresa
Downes, to whom Plaintiff directly reported.   (Theresa Downes
Depo. at 30:13-18.)   Plaintiff was in charge of the accounting
department and was given responsibility for a variety of human
resource functions as well.   (Arpajian Depo. at 56:13-25; 53:21-
54:2.)   Additionally, in or about May of 1999, Plaintiff began to
serve on Property Solutions's Board of Directors.   (Id. at 52:15-
24.)

Plaintiff alleges that beginning in early 2000, Defendant
Timothy Downes started making comments to her of a sexual and
inappropriate nature.   (Pl.'s Ex. 5.)   Plaintiff's first formal
complaint of sexual harassment was made following an employee
dinner in June of 2000.   (Arpajian Depo. at 91:6-21.)   At this
dinner, Defendant Downes allegedly insisted that Plaintiff be
seated next to him, then proceeded to put his arm around her and
announce to the waiter and table, which included his wife, that
Plaintiff was his "girlfriend."   (Id.)   Plaintiff complained to
Theresa Downes the following day but was told that "no one could
control [Defendant Downes]."   (Id.)

In October of 2000, Defendant Downes was admitted to a
rehabilitation center for abuse of prescription drugs.   (Theresa
Downes Depo. at 65:13-16.)   According to Theresa Downes, during

3

this time, Defendant Downes was behaving in the workplace "like somebody on drugs." (Id. at 60:21-61:3.)  In December of 2000, Defendant Downes was removed from the Board of Directors due to drug abuse.  (Id. at 59:10-12.)  The following month, Defendant Downes was placed on employment probation due to his substance abuse problem and there was discussion of his possible termination.  (Id. at 56:1-20; 58:14-19.)

In early 2001, Plaintiff, on her own initiative, began preparing an employee handbook for Property Solutions, including a sexual harassment policy.  (Arpajian Depo. at 73:8-10.)  No such handbook or policy previously existed.  (Id.; Theresa Downes Depo. at 77:12-78:1.)  At the end of May 2001, the sexual harassment policy created by Plaintiff was distributed to all employees.  (Pl.'s Ex. 6.)  Each employee was then instructed to complete a sexual harassment training course, which was offered online, by June 30, 2001.  (Pl.'s Ex. 7.)  Both Theresa Downes and Defendant Downes failed to take the online training course by the required deadline for all employees.  (Pl.'s Ex. 8.)

In July of 2001, Theresa Downes and Defendant Downes began the process of obtaining a divorce.  (Theresa Downes Depo. at 84:15-19.)  Realizing that the divorce could result in ownership change, Plaintiff made a request at that time to be provided with an employment agreement.  (Arpajian Depo. at 184:4-9.)  Plaintiff maintains that the following day, Defendant Downes called her

4

into his office and proceeded to tell Plaintiff that her job would be protected if she was "nice" to him, elaborating that he would not have a problem signing an employment agreement if she "got on [her] knees and under his desk."  (Id. at 184:12-20.) Plaintiff interpreted this comment as a request by Defendant Downes to perform oral sex on him.  (Arpajian Affidavit at ¶7.) Defendant Gallagher and Theresa Downes have acknowledged that this statement could be interpreted as a request for oral sex. (Gallagher Depo. at 132:2-6; Theresa Downes Depo. at 71:22-72:10.)  Within days, Plaintiff received an email indicating that Property Solutions was denying her request for an employment agreement.  (Arpajian Depo. at 185:8-10.)

Plaintiff maintains that she went to both Theresa Downes and Defendant Gallagher and complained of Defendant Downes's conduct, with specific reference to the "under the desk" comment.  (Id. at 186:18-19.)  Despite these complaints, and Plaintiff's previous complaint, there was no action taken against Defendant Downes. (Arpajian Aff. at ¶5.)

In addition to the specific events precipitating Plaintiff's complaints, Plaintiff also alleges the following comments or conduct directed at Plaintiff by Defendant Downes: (1) ordering Plaintiff to "take one for the team," meaning to have sex with a client to get business; (2) telling Plaintiff that he wanted to "do" certain female employees; (3) introducing Plaintiff at a

work convention as his "hot CFO, who dates clients"; (4) running his hand up Plaintiff's thigh at a company party when she was bending over to pick up ice off the floor, in front of her boyfriend and colleagues; (5) advising Plaintiff that one of the company's clients had told him that he should be "getting some" from her (meaning having sex with her because he was Plaintiff's employer); (6) telling Plaintiff on repeated occasions of his desire for sex while traveling for work; (7) telling Plaintiff that he would "play with himself" in hotel rooms while traveling and watching "dirty movies"; (8) telling Plaintiff that he loved to watch naked women on beaches; (9) inquiring into Plaintiff's personal life; (10) telling Plaintiff that a colleague was having sex with clients "and still not getting the business"; (11) describing how women would "hit on him" and how they "wanted" him; (12) putting his arm around Plaintiff while visibly intoxicated at the company Christmas party and saying that he loved Plaintiff's skirt; (13) telling Plaintiff at work that she was "showing a lot of leg"; and (14) totally disregarding his own impropriety towards a female employee who had alleged sexual harassment against him.  (Pl.'s Ex. 5.)

In late 2001, another female subordinate of Defendant Downes, Suzanne Gibson, came to Plaintiff with a complaint. (Arpajian Depo. at 93:17-25.)  Ms. Gibson claimed that Defendant Downes was asking too many questions about her personal life and

6

requiring that she spend an inordinate amount of time with him
over the weekends.  (Id.)

On October 24, 2001, Defendant Downes attended a conference
in Chicago with two of his female subordinates, Ms. Gibson and
Michelle Vidovich.  (Pl.'s Ex. 9.)  Two days later, on October
26, 2001, Plaintiff and Theresa Downes were both contacted by Ms.
Vidovich, who complained of inappropriate conduct by Defendant
Downes at the conference.  (Arpajian Aff. at ¶8; Theresa Downes
Depo. at 82:18-24.)  Ms. Gibson also made additional allegations
of inappropriate conduct by Defendant Downes at the Chicago
conference.  (Arpajian Depo. at 95:15-97:3.)

Immediately following receipt of Ms. Vidovich's complaint,
Theresa Downes advised Defendant Gallagher of the allegations and
spoke with her attorney.  (Theresa Downes Depo. at 83:23-84:4.)
Defendant Downes was then advised of Ms. Vidovich's complaints
and specifically ordered to cease any conduct with her.
(Gallagher Depo. at 190:7-10.)  However, Defendant Downes not
only continued to contact Ms. Vidovich, but also allegedly
threatened her and actively retaliated against her.  (Id. at
190:11-191:16.)  Specifically, Defendant Downes threatened to
"take appropriate action" against Ms. Vidovich and take away her
corporate credit card.  (Id. at 190:11-191:16; Pl.'s Ex. 11.)
Despite this, Defendants Gallagher and Property Solutions decided

7

that Defendant Downes should be given a second chance rather than terminated.  (Gallagher Depo. at 191:18-20; 195:2-16.)

In connection with Ms. Vidovich's complaint, Defendant Property Solutions hired an investigator, Pamela Perry, to investigate the allegations and produce a report ("Vidovich Report").  (Pl.'s Ex. 12.)  Although Plaintiff's prior complaint of sexual harassment is acknowledged in the Vidovich Report, as well as the fact that she had received the initial complaint from Ms. Vidovich, Plaintiff was never interviewed as part of the investigation.  (Id. at 1-3, 5; Arpajian Aff. at ¶10.)  Without explanation, the report claims Plaintiff was "unavailable" to be interviewed.  (Pl.'s Ex. 12 at 3; Arpajian Aff. at ¶11.)

At the conclusion of the investigation of Ms. Vidovich's claims, no immediate action was taken against Defendant Downes. The only discipline that Defendant Downes received was probation, which was not implemented until February of 2002, approximately five months after Ms. Vidovich came forward.  (Pl.'s Ex. 14.)

Following Ms. Vidovich's complaint in October of 2001, Defendant Downes engaged in additional harassing conduct towards Plaintiff including (1) calling Plaintiff and leaving her incoherent messages, claiming that he loved her; (2) making comments to Plaintiff related to woman hitting on him and wanting to have sex with him; (3) telling Plaintiff that once he acquired ownership of the company, he would get rid of anyone who wasn't

8

"nice" to him, which he had previously explained meant immediately getting under his desk; and (4) talking to Plaintiff about Ms. Vidovich's harassment allegations. (Arpajian Depo. at 189:19-25; 190:5-21; 222:1-13; 226:1-18.) Plaintiff also claims to have observed sexist behavior by Defendant Gallagher including sending Plaintiff emails which contained jokes about women, making derogatory comments about the traditional role of women, referring to Theresa Downes as "waddling" and "fat," and exhibiting little respect for female engineers and denying them job opportunities. (Id. at 70:9-21; 259:7-25; 260:1-6; 263:6-24.)

Following her first complaint of sexual harassment in June of 2000, Plaintiff alleges that she began experiencing retaliatory and discriminatory conduct. In February of 2001, Plaintiff was advised by Theresa Downes that she would not be permitted to attend the annual West Coast Mortgage Bankers' National Association Conference which she had attended the previous year. (Arpajian Depo. at 159:17-160:6.) Moreover, in the months following Plaintiff's second complaint in July 2001, Plaintiff alleges that Theresa Downes became increasingly hostile toward her. For example, Theresa Downes admitted that she went through Plaintiff's mail and questioned her on the contents before Plaintiff had the opportunity to read the mail herself. (Id. at 145:14-16; Theresa Downes Depo. at 153:106.) Theresa

9

Downes also began going directly to Plaintiff's staff with
questions and would either ignore Plaintiff entirely or act in a
confrontational manner on various issues.  (Arpajian Depo. at
145:17-21.)

On February 27, 2003, Theresa Downes and Defendant Downes
were divorced and Theresa Downes departed Property Solutions,
selling her shares to Defendant Gallagher and Defendant Downes,
thereby making the two 50/50 owners of the company.  (Gallagher
Depo. at 29:6-13.)  At that time, Defendant Gallagher was
elevated to the position of President.  (Deposition of Timothy
Downes at 26:18-23.)  Defendant Gallagher retained his prior
responsibilities as head of the environmental and engineering
departments and also assumed direct control over the departments
formerly run by Theresa Downes, namely the accounting and human
resources departments.  (Gallagher Depo. at 64:10-13.)  Thus,
Plaintiff began reporting to Defendant Gallagher at that time.
(Id. at 65:17-24.)  Defendant Downes assumed the role of Vice
President responsible for sales and marketing.  (Timothy Downes
Depo. at 26:5-7.)

After February 2003, Defendants Gallagher and Downes
allegedly began to focus on systematically diminishing
Plaintiff's role at Property Solutions.  (Id. at 258:25-259:5.)
Plaintiff was no longer invited to attend certain senior
engineering meetings she had previously attended and her input

10

was no longer sought in connection with issues that fell within her purview.  (Id. at 149:24-151:3; 153:7-14.)  In those meetings with Defendants Gallagher and Downes that Plaintiff was permitted to attend, her role was dramatically reduced and the courtesies she was previously extended ceased.  (Id. at 152:15-19.)

On September 3, 2003, Plaintiff was advised by Defendants Gallagher and Downes that she was being terminated.  (Pl.'s Ex. 5.)  In her termination meeting, Defendant Downes stated that he wanted to try having a controller perform Plaintiff's CFO duties, at a much lower salary.  (Gallagher Depo. at 226:10-14.) Defendant Downes further explained that Plaintiff's replacement had additional experience that the company was seeking in the area of government contracts.  (Id. at 226:17-24; Arpajian Depo. at 266:5-13.)  Plaintiff was never advised that the decision to terminate her employment was based on salary considerations, nor was Plaintiff made an offer to stay with the company at a lesser salary or in another capacity.  (Arpajian Aff. at ¶¶15, 16.) Defendants' termination memo, dated September 3, 2003, does not make any mention of the salary issue and explicitly states, contrary to Defendants' repeated assertions, that Defendant Downes and Defendant Gallagher jointly made the decision to terminate Plaintiff.  (Pl.'s Ex. 20.)

Plaintiff filed her initial Complaint with this Court on September 30, 2003.  Plaintiff filed a Charge of Discrimination

11

with the Equal Employment Opportunity Commission ("EEOC") on October 8, 2003 and thereafter amended her Complaint on May 10, 2004.  The Amended Complaint sets forth a hostile work environment, sexual harassment, and retaliation claim under the New Jersey Law Against Discrimination ("NJLAD") (Count I), an aiding and abetting claim against Defendant Downes under the NJLAD (Count II), an aiding and abetting claim against Defendant Gallagher under the NJLAD (Count III), and a hostile work environment, sexual harassment, and retaliation claim under Title VII (Count IV).  The instant motion for summary judgment was filed by Defendants on May 12, 2005 and oral argument was heard on July 22, 2005.  Following oral argument, the Court permitted the parties to submit supplemental briefing on the statute of limitations issues.  All briefing is now complete and the instant motion is ripe for adjudication.

## II.  DISCUSSION

### A.  Summary Judgment Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might

affect the outcome of the suit under the applicable rule of law.
Id. Disputes over irrelevant or unnecessary facts will not
preclude a grant of summary judgment.   Id.

In deciding whether there is a disputed issue of material
fact, the court must view the evidence in favor of the non-moving
party by extending any reasonable favorable inference to that
party; in other words, "[T]he nonmoving party's evidence 'is to
be believed, and all justifiable inferences are to be drawn in
[that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552
(1999) (quoting Liberty Lobby, 477 U.S. at 255).  The threshold
inquiry is whether there are "any genuine factual issues that
properly can be resolved only by a finder of fact because they
may reasonably be resolved in favor of either party." Liberty
Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining
Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

The moving party always bears the initial burden of showing
that no genuine issue of material fact exists, regardless of
which party ultimately would have the burden of persuasion at
trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);
Country Floors v. Partnership of Gepner and Ford, 930 F.2d 1056,
1061-63 (3d Cir. 1991); Lucent Info. Manage. v. Lucent Tech., 986
F. Supp. 253, 257 (D.N.J. 1997), aff'd, 186 F.3d 311 (3d Cir.
1999); Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989),
cert. denied, 493 U.S. 1023 (1990).  However, where the nonmoving

13

party bears the burden of persuasion at trial, as plaintiff does in the present case, "the burden on the moving party may be discharged by 'showing' –- that is, pointing out to the district court —- that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp., 477 U.S. at 325.

The non-moving party "may not rest upon the mere allegations or denials of" its pleading in order to show the existence of a genuine issue.  Fed. R. Civ. P. 56(e).  Plaintiff must do more than rely only "upon bare assertions, conclusory allegations or suspicions."  Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985), cert. denied, 474 U.S. 1010 (1985) (citation omitted); see Liberty Lobby, 477 U.S. at 249-50.  Thus, if the plaintiff's evidence is a mere scintilla or is "not significantly probative," the court may grant summary judgment.  Liberty Lobby, 477 U.S. at 249-50; Country Floors, 930 F.2d at 1061-62.

**B.    Time Barring of Claims**

Defendants argue first that Plaintiff's hostile work environment and discrimination claims on the basis of sex are time-barred.  Plaintiff meanwhile maintains that her claims are timely under the continuing violations theory.  In Havens Realty Corp. v. Coleman, 455 U.S. 363, 380 (1982), the Supreme Court held that when a plaintiff challenges more than just one incident of unlawful conduct, or an unlawful practice that continues into the limitations period, the complaint is timely filed.  The

14

actual violations must be continuing, however, and not merely the effects of the prior violation.  <u>Delaware State College v. Ricks</u>, 449 U.S. 250, 257 (1980).

The continuing violation theory thus permits a plaintiff to pursue a claim for discriminatory conduct that started before the filing period if she can demonstrate that the act is part of an ongoing practice or pattern of discrimination.  <u>West v. Philadelphia Elec. Co.</u>, 45 F.3d 744, 754 (3d Cir. 1995).  To demonstrate a continuing violation, Plaintiff must thus show: (1) that at least one discriminatory or harassing act occurred within the relevant time period; and (2) that the harassment or discrimination represents a continuing pattern, or more than the occurrence of isolated or sporadic acts of intentional discrimination.  <u>Id</u>. at 754-55.

This standard was elaborated upon and clarified by the Supreme Court in <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002).  In <u>National Railroad Passenger Corp.</u>, Justice Thomas, writing for the Court, drew a distinction between discrete discriminatory acts and hostile work environment claims.  A discriminatory act, Justice Thomas wrote, "'occurred' on the day that it 'happened'" and a party must therefore file a charge within the relevant time filing period of the date of the act or lose the ability to recover for it.  <u>Id</u>. at 110.  Hostile work environment claims, however, are different from discrete acts in

15

that such claims are based on the cumulative effect of individual acts.  Id. at 117 ("A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'")  Thus, for such claims, the Court articulated the following standard:

> Provided that an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability.  That act need not, however, be the last act.  As long as the employer has engaged in enough activity to make out an actionable hostile work environment claim, an unlawful employment practice has "occurred," even if it is still occurring.  Subsequent acts, however, may still be a part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole.

Id.

## 1.   **NJLAD Hostile Work Environment Claim**

In Montells v. Haynes, 627 A.2d 654 (N.J. 1993), the New Jersey Supreme Court established a two year statute of limitations for all claims brought under the NJLAD after July 23, 1993.  Generally, this statute of limitations begins to run when the adverse employment decision is made and communicated to the plaintiff.  New Jersey courts, however, have adopted the continuing violations theory that has been applied to suits traditionally brought under Title VII.  Terry v. Mercer County, 414 A.2d 30 (N.J. Super. Ct. App. Div. 1980).  To avail herself

16

of this theory in establishing the timeliness of her hostile work environment claim under the NJLAD, Plaintiff need only demonstrate an incident of discrimination which occurred in the two year period prior to the filing of her Complaint on September 30, 2003, and which was of a continuing nature.

Plaintiff has amply demonstrated specific incidents of sexual harassment directed at her by Defendant Downes in the two year period prior to September 30, 2003 including: (1) repeatedly telling Plaintiff that once he got his shares of the company he would "get rid of anyone" who "wasn't nice to him"; (2) describing to Plaintiff how women would "hit on him" and wanted to have sex with him; (3) making harassing phone calls to Plaintiff, on one occasion stating that he "loved her"; and (4) discussing the allegations of another employee, Michelle Vidovich, with Plaintiff against her wishes.  (Arpajian Depo. at 189:19-25; 190:5-21; 222:1-13; 226:1-18.)

Plaintiff also relies, as she may do under the law, upon the harassment of another female employee of which she was aware, namely the complaints of Suzanne Gibson and Michelle Vidovich. In Lehmann v. Toys "R" Us, 626 A.2d 445 (N.J. 1993), the Supreme Court of New Jersey expressed that in making a showing that one's working conditions were affected by harassment to the point at which a reasonable person would consider the working environment hostile, the plaintiff may use evidence that other individuals in

the workplace were sexually harassed.  Id. at 457.  "The plaintiff's work environment is affected not only by conduct directed at herself but also by the treatment of others.  A woman's perception that her work environment is hostile to women will obviously be reinforced if she witnesses the harassment of other female workers."  Id.  The court therefore held that "the plaintiff need not personally have been the target of each or any instance of offensive or harassing conduct."  Id.  Here, Ms. Gibson complained about Defendant Downes in late 2001 and Ms. Vidovich first contacted Plaintiff in October of that year, providing, in explicit detail, the sexual harassment subjected upon her by Defendant Downes.  Plaintiff thus draws upon these complaints to further establish the sexually charged environment in which she was forced to work.

Plaintiff has therefore availed herself of the continuing violations theory in that she has alleged numerous incidents of sexual harassment by Defendant Downes that date as far back as June of 2000 and continued thereafter, thereby setting forth an actionable "persistent, on-going pattern" of harassment.

### 2.   **Title VII Hostile Work Environment Claim**

Title VII requires that an aggrieved party file a charge with the EEOC within 300 days after the alleged unlawful practice occurred.  Verdin v. Weeks Marine, Inc., 124 Fed. Appx. 92, 94 (3d Cir. 2005).  As under the NJLAD, the continuing violations

18

theory is also applicable to claims brought under Title VII.
Plaintiff thus need only show that one act of the continuing
harassment took place within the 300 day period prior to her
filing a Charge of Discrimination with the EEOC.  As Plaintiff
filed her EEOC Charge on October 8, 2003, the relevant Title VII
time period is after December 12, 2002.

Defendants argue that Plaintiff has not alleged any incident
of sexual harassment beyond July of 2001, thereby barring
Plaintiff's claims under Title VII.  This Court disagrees.  The
record reflects that Plaintiff was repeatedly subjected to open
hostility that pervaded Plaintiff's work environment and created
a "sexist atmosphere" up until the time of her termination.  (See
Arpajian Depo. at 189:19-22; 192:4.)

Despite Plaintiff's numerous complaints about Defendant
Downes, in addition to the various concerns voiced by others,
Plaintiff's employers failed to take any action against him.
Plaintiff was therefore forced to interact with Defendant Downes
every day during the final 300 days of her employment with
Defendant Property Solutions, all the while aware of Defendants'
refusal to take any action to remove Downes from the workplace or
otherwise discipline him.  In so doing, the Defendants' conduct
essentially informed Plaintiff that Timothy Downes's ongoing
inappropriate behavior was acceptable and his value as an
employee outweighed any concern the company might otherwise have

19

with providing female employees a harassment-free working
environment.  Indeed, as one court in this district has noted:

> Unlike other forms of sexual discrimination,
> employer liability for a hostile work
> environment is created not by the random
> crude acts of employees, but rather the
> employer's reaction or <u>non-reaction</u> to these
> acts.  . . . An employer cannot sit back and
> adopt a "boys will be boys" attitude . . . ;
> it must move promptly and forcibly to make it
> clear to the entire workforce that conduct
> which demeans women or makes them feel
> unwelcome will not be tolerated.

<u>Hurley v. Atlantic City Police Department</u>, 933 F. Supp. 396, 401

(D.N.J. 1996), <u>aff'd</u>, 174 F.3d 95 (3d Cir. 1999), <u>cert. denied</u>,

528 U.S. 1078 (2000) (emphasis added).

Moreover, in February of 2003, the balance of power shifted
in Plaintiff's workplace, as Defendant Downes became a 50/50
owner of the business with Defendant Gallagher, giving Downes,
for the first time, the ability to terminate Plaintiff.  Where
the work environment had been threatening for Plaintiff before,
Downes's new position served only to heighten the anxiety and
hostility Plaintiff experienced at work.  Suddenly, upon
Defendant Downes's acquisition of an ownership interest in
Property Solutions, Plaintiff was no longer invited to attend
certain senior engineering meetings that she had previously
attended and her input was no longer sought in connection with
issues regarding financial or human resource matters.  (<u>Id</u>. at
149:24-151:3; 153:7-14.)  Such intentional exclusion and

20

alienation may be viewed as additional acts contributing to
Plaintiff's hostile work environment.

Finally, Plaintiff's ultimate termination on September 3,
2003 was the final incident stemming from the hostile work
environment in which she worked and represents the type of
"permanence" that triggers a plaintiff's awareness of the need to
assert her rights.  See Cowell v. Palmer Township, 263 F.3d 286,
292 (3d Cir. 2001); Schneck v. Saucon Valley School District, 340
F. Supp. 2d 558, 581 (E.D. Pa. 2004).  Indeed, the existence of a
"discrete event such as a lost job," which would trigger a
plaintiff's duty to assert her rights for that deprivation, is an
important factor in evaluating the existence of a continuing
violation.  West, 45 F.3d at 756.  With no prior notice,
Plaintiff was called into a meeting with Defendants Downes and
Gallagher and informed that her job was being eliminated, that
she was being terminated effective immediately, and that a man
had been hired to perform her corporate functions.  Defendant
Downes actively participated in the decision to terminate
Plaintiff, as the record evidence supports.  (See Pl.'s Ex. 20.)
This final act of hostility most certainly occurred within the
statutory period and caused Plaintiff to file her Complaint in
this Court three weeks later.  Thus, for these reasons, the Court
finds that Plaintiff's Title VII claims are not barred by the

relevant statute of limitations, as the continuing violations
theory insulates Plaintiff's claims from dismissal.

C.  **Gender Discrimination Claim**

Gender discrimination claims under the NJLAD and Title VII
are analyzed under the McDonnell Douglas burden-shifting
analysis.  McDonnell-Douglas Corp. v Green, 411 U.S. 792 (1973).
Under this analysis, the initial burden is with the plaintiff to
present a prima facie case, which requires that the plaintiff
establish that: (1) she was a member of the protected class; (2)
she was qualified for the position at issue; (3) she suffered an
adverse employment action; and (4) similarly situated persons
outside of the protected class were treated more favorably.  See
Monaco v. American General Assurance Co., 359 F.3d 296, 300 (3d
Cir. 2004).  The burden then shifts to the defendant to
articulate a legitimate, non-discriminatory reason for the
action.  However, a plaintiff may prove intentional
discrimination and prevail at trial by challenging the employer's
reason as unworthy of credence, thereby rendering it pretextual,
or that the real reason for the action was discrimination.
McDonnell Douglas, 411 U.S. at 832.

Defendants do not contest that Plaintiff has made out a
prima facie case of sex discrimination.  The sole issue therefore
is whether, viewing the evidence in a light most favorable to
Plaintiff, a reasonable factfinder could infer that Defendants'

22

proffered reason is pretext or that the motivation for
Plaintiff's termination was discriminatory.

Defendants articulated at the beginning of this case that
"after a review of Plaintiff's job duties and her salary, it was
determined that Plaintiff was overcompensated and because,
Defendant Gallagher, the President of Property Solutions,
determined that Property Solutions could hire a qualified
replacement to perform those job duties at a substantially lower
rate of pay." (Pl.'s Ex. 19 at Answer 1.)  In the instant motion
for summary judgment, Defendants now assert "that [Defendant
Gallagher] could hire a corporate controller to perform most of
the functions that Plaintiff had performed for a reduced salary."
(Defs.' Stmt. of Facts at ¶17.)  Plaintiff argues these bases for
her termination are pretextual.

Plaintiff points to a number of material factual issues
which preclude the entry of summary judgment including that
reducing Plaintiff's salary created a minimal before-tax savings,
that no document has been produced to evidence this cost cutting
analysis, that it was only Plaintiff's compensation that was
reduced, and that Property Solutions was enjoying increasing
profits each year that Plaintiff was acting as CFO and Head of
Human Resources.

In addition, Defendants have offered contradictory reasons
to justify replacing Plaintiff with Andrew Myers.  Shifting

explanations for an employment action is one of the strongest
types of evidence of pretext.  Waddell v. Small Tube Products,
Inc., 799 F.2d 69, 73 (3d Cir. 1986).  According to the
"Termination Meeting" memo created by Defendant Gallagher, as
well as Plaintiff's deposition testimony, Defendant Downes told
Plaintiff that Mr. Meyers had been selected as her replacement
because he had "government contracts" experience, an area that
Property Solutions allegedly wanted to pursue.  (Pl.'s Ex. 20.)
However, Defendant Gallagher, in his deposition, claimed that
Defendant Downes had "rambled on" about things at the termination
meeting, like the "government contracts" issue which had not been
pertinent to his decision.  (Gallagher Depo. at 226:17-24.)

     Plaintiff thus contends that Defendants' explanation lacks
credibility.  For example, Plaintiff maintains that Defendants'
assertion that Defendant Downes had no involvement in Plaintiff's
termination or the decision to terminate her is a distortion.
Defendant Downes allegedly made known his intent to replace
Plaintiff six months to a year prior to her termination.
(Deposition of Sarah Arnold at 41:1-22.)  Defendant Downes was
the one who first learned of Plaintiff's replacement, who first
contacted that individual and who then attended his interview at
the Harvest Diner.  (Gallagher Depo. at 135:11-21; Myers Depo. at
51:9-16; 52:8-20.)  Moreover, Defendant Downes explained, at
Plaintiff's termination meeting, the reasons why they were

replacing her with Mr. Myers.  (Gallagher Depo. at 226:10-14; 17-24.)

Plaintiff also argues that Myers was not qualified for the position he assumed.  "A comparison of candidates' qualifications is relevant to determine whether there is reason to believe that an employer's proffered reason for its employment decision is pretextual."  Conine v. SEPTA, 2005 WL 639733, at *8 (E.D. Pa. Mar. 17, 2005).  Plaintiff's job functions at Property Solutions were those of both CFO and Head of Human Resources.  Mr. Meyers's position, however, has been termed "Corporate Controller."  The job description for this position nonetheless specifies the duties which were previously performed by Plaintiff, including those of human resources.  (Arpajian Aff. at ¶13.)  Moreover, Plaintiff's educational background is substantially more extensive than that of Myers and Myers's employment record contains questionable gaps.  (Myers Depo. at 64:18-22; Arpajian Depo. at 7:15-8:4; 10:14-20; 12:23-13:2; 33:21-34:19.)  Notably, Defendant Gallagher testified at his deposition that Plaintiff was qualified to do everything that he wanted from the position. (Gallagher Depo. at 158:14-16.)

A reasonable fact finder could also conclude that Defendants' search for Plaintiff's replacement is suspect.  Mr. Myers was interviewed at a diner and was not questioned about why he had been unemployed for eight months.  (Myers Depo. at 64:18-

25

22.)  Defendant Gallagher admits that he did nothing other than
"speak to [his] dad and [his] golfing buddy" in his efforts to
find a replacement.  (Gallagher Depo. at 121.)  He placed no ads
or job postings in any forum.  (<u>Id</u>. at 120-21.)  Defendants have
produced no resumes, no notes, and no names of any other
candidate who applied or was interviewed for the job.  (<u>Id</u>. at
138:13-16; 149:21-150:2.)

     This evidence of Defendants' possible untruthfulness,
implausibility of the proffered reasons for Plaintiff's
termination, attempts or lack thereof to hire a qualified
replacement for Plaintiff, and the overwhelming history of sexual
harassment, gender discrimination and sexist behavior directed at
Plaintiff are all factors to be considered by a jury and which
could lead reasonable minds to conclude that Defendants' stated
reasons for their actions are pretextual.  Thus, Defendants'
motion for summary judgment as to Plaintiff's hostile work
environment claims must be denied.

**D.   <u>Retaliation Claim</u>**

     Like gender discrimination claims, retaliation claims
brought under Title VII and the NJLAD are analyzed under the same
<u>McDonnell Douglass</u> burden shifting framework.  <u>Abramson v.
William Patterson College</u>, 260 F.3d 265, 286 (3d Cir. 2001).  To
establish a prima facie case of retaliation, a plaintiff must
show that (1) the employee engaged in a protected activity; (2)

26

the employer took an adverse action against the employee after learning of the protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action.  Abramson, 260 F.3d at 286.  Here, there is no material dispute that the first two requisite prongs for a prima facie case for retaliation are met.  Plaintiff made at least two complaints of sexual harassment to management and was subjected to adverse actions thereafter by Defendants, including her termination.  Defendants' sole argument in support of summary judgment is as to the third prong, causation.

Plaintiff maintains that the retaliation she experienced began as far back as February 2001, when she was denied the opportunity by Theresa Downes to attend the annual West Coast Mortgage Bankers' National Association Conference.  (Arpajian Depo. At 159:17-160.)  Additional retaliation allegedly ensued after this time by Defendants Gallagher and Downes as well. Plaintiff maintains that the systemic diminishment of Plaintiff's role and other actions taken against her were retaliatory and a precursor to her ultimate termination.  In light of this, Plaintiff argues that her actual termination was the final retaliatory act.

In many retaliation cases, the adverse action comes almost immediately upon the employee's complaint or charge.  However, "temporal proximity is not the only way to show causation."

27

<u>Clarkson v. Pennsylvania State Police</u>, 2005 WL 1513773, *7 (E.D. Pa. Oct. 10, 2000).  <u>See</u> <u>also</u> <u>Robinson v. SEPTA</u>, 982 F.2d 892 (3d Cir. 1993) (finding twenty-two months between protected activity and termination sufficient to support an inference of retaliation).  Indeed, it is often the case that a sophisticated employer, familiar with employment law, would wait rather than immediately retaliate.

The timing of Plaintiff's termination here is unusually suggestive when considered in relation to when Defendant Downes, the man she had accused of sexual harassment, acquired his 50 percent ownership interest and the ability to terminate her. Within six months to a year before Plaintiff's termination, Defendant Downes had already expressed his intent to terminate Plaintiff.  (<u>See</u> Arnold Depo. at 41:1-22.)  On February 27, 2003, Defendants Downes and Gallagher became 50/50 owners and just six months later, a job offer had been made to Myers, followed by Plaintiff's termination.

Equally suggestive of retaliation is the relation of Plaintiff's termination to her July 2001 complaint of sexual harassment.  Just one month past two years after Plaintiff made her last complaint to Defendants, Myers was offered Plaintiff's position and her termination was imminent.  Two years is the statute of limitations for an NJLAD claim and had Defendants mistakenly believed there was no actionable conduct after July

28

2001 (the date of the "under the desk" comment), Plaintiff would
have been out of her statute of limitations period at the time of
termination.  In light of the fact that a prior employee, Ms.
Vidovich, had asserted an NJLAD claim and Defendants had received
legal counsel in connection with that claim, the notion that they
would have been unaware of the applicable statute of limitations
may also reasonably be found to be incredible.  (Theresa Downes
Depo. at 83:23-84:4.)

Thus, although Defendants have justified Plaintiff's
termination with the rationale of saving money, ample record
evidence exists for a jury to reject this reason.  As such,
genuine issues of material fact exist, thereby defeating
Defendants' motion for summary judgment.

E.    **Availability of Punitive Damages**

Plaintiff seeks an award of punitive damages in connection
with her NJLAD and Title VII claims.  Under Title VII, a
plaintiff may recover punitive damages where the defendant
engaged in a discriminatory practice with "malice or reckless
indifference to the plaintiff's federally protected rights."  42
U.S.C. § 1981(a)(b)(1).  Punitive damages are properly assessed
against an employer under Title VII when one of four conditions
is met: "(1) the principal authorized the doing and the manner of
the act, or (2) the agent was unfit and the principal was
reckless in employing him, or (3) the principal or a managerial

29

agent of the principal ratified or approved the act, or (4) the agent was employed in a managerial capacity and was acting in the scope of employment." Kolstad v. American Dental Association, Inc., 527 U.S. 526, 542-43 (1999).

Here, by virtue of the positions of Defendants Gallagher and Downes at the time of the alleged violations, punitive damages could be assessed under Title VII. While allegedly subjecting Plaintiff and other female employees to sexual harassment, Defendant Downes was a manager and used his position of power to further his harassment. That Property Solutions chose to maintain his employment and permit his continued contact with female employees, despite repeated claims of sexual harassment and known drug problems, may be viewed as reckless. Moreover, the act of firing Plaintiff, a tangible employment action, was necessarily approved and ratified by the owners of Property Solutions.

Under the NJLAD, the legal standard for punitive damage claims is a matter of state law. See Griffiths v. CIGNA Corp., 857 F. Supp. 399, 409-10 (E.D. Pa. 1994), aff'd, 60 F.3d 814 (3d Cir. 1995). Punitive damages, if available, are only available under the "heightened standard" of liability established in Lehmann v. Toys 'R Us, Inc., 626 A.2d 445 (N.J. 1993), in which evidence exists of "actual participation by upper management or willful indifference" to such violations. Id. at 464-65.

30

Due to the fact that Defendants Gallagher and Downes were both 50/50 owners at the time they terminated Plaintiff, the participation of upper management is clearly evident.  Even prior to this, both men were unquestionably in such positions relative to Plaintiff.

Therefore, this Court finds that punitive damages cannot be ruled out for Plaintiff under both Title VII and the NJLAD and Defendants' motion for summary judgment must be denied.

### III.   <u>CONCLUSION</u>

For the reasons discussed above, Defendants' motion for summary judgment will be denied in all respects.  The accompanying Order will be entered.


**August 16, 2005**                          **s/ Jerome B. Simandle**
Date                                         JEROME B. SIMANDLE
                                             United States District Judge

31